# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

JACQULYN M. RIEKENS,

        Plaintiff,

vs.

KILOLO KIJAKAZI,[1]
Acting Commissioner of Social Security,

        Defendant.

Case No. 20-CV-1005-LTS-KEM

**REPORT AND RECOMMENDATION**

_____

Plaintiff Jacqulyn M. Riekens seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. Riekens argues that the administrative law judge (ALJ) erred by discounting her subjective complaints and the medical opinions of two of her treating providers, by relying on medical opinions from state agency medical consultants, and by failing to address whether her migraines and other impairments equaled the severity of Listing 11.02. I recommend **reversing** the Commissioner's decision **and remanding** for further proceedings.

## I.    BACKGROUND[2]

From October 2005 to May 2016, Riekens worked a full-time desk job doing collections for a hospital. AR 42, 48, 247, 250. As early as 2011, she and her doctor

_____

[1] Kilolo Kijakazi is substituted for her predecessor in accordance with Federal Rule of Civil Procedure 25(d).

[2] For a more thorough overview, see the Joint Statement of Facts, filed at Doc. 14.

completed paperwork for intermittent leave under the Family and Medical Leave Act (FMLA) due to her migraines. *See* AR 383-84. Her FMLA forms from 2011 and 2012 indicate that once or twice every two months, she would need to take one to two days off work due to a debilitating migraine. AR 383-86, 389-90. In early 2014, her FMLA paperwork excused her from work up to seven times a month for eight hours at a time due to migraines, but by January 2016, her paperwork indicated severe migraines requiring leave only twice a month for two days per episode. AR 396-99, 1497-1500. April 2016 FMLA paperwork indicated the same. AR 403-06. It also indicated that when Riekens "[wa]s in a cycle of headaches," extended leave would be beneficial, as going to work prevented Riekens's headaches from improving and seemed to make them worse. *Id.* Riekens's neurological provider, nurse practitioner Kelli Tornstrom (NP Tornstrom), noted that she wanted Riekens to take a one-month break from work to see if it impacted her headaches. AR 534, 1333, 1340. After some resistance from her employer, Riekens's one-month FMLA leave began on May 11, 2016. *Id.*

Two weeks into her leave, Riekens reported it was "unclear" if her headaches had improved. AR 1333. She stated that the weather fluctuated her first week off, which tended to trigger migraines, but that during the second week, waking up without an alarm helped somewhat. *Id.* NP Tornstrom noted being off work seemed to provide a "slight improvement" in headache severity. *Id.* On June 7, near the end of her leave, Riekens told NP Tornstrom that especially over the last week, her headaches and migraines had not been as severe, rating her daily headache a 2 out of 10 on the pain scale, where before they had been a 7 or 8. AR 1367. She noted that people had said she looked like she was feeling better, that she had not had to wear tinted glasses, and that she had been more active completing household tasks around the house. *Id.* She said she was at a loss on how to proceed: she did not want to jeopardize her job, but on the other hand, she did not want to lose the progress she had made with her headaches. *Id.* NP Tornstrom noted they would reevaluate in a week to see if improvement continued. *Id.* She also advised Riekens to consult with the Social Security Administration about applying for disability

2

as a possible alternative to changing to a different type of job that would not aggravate her headaches. *Id*.

Two days later, on June 9, 2016, Riekens filed for DI benefits. AR 59; *see also* Doc. 14. In August 2016, Riekens filed for long-term disability from her employer. AR 1505-06. In support of that application, NP Tornstrom noted Riekens's headaches had worsened as the result of making medication changes, which were recommended by a headache specialist at the Mayo Clinic, who Riekens had consulted in early May 2016. *Id*.; *see also* AR 1156-65. NP Tornstrom recommended Riekens remain off work indefinitely in the hope of returning when her condition improved. AR 1505. Riekens never went back to work.

The Social Security Administration denied Riekens's DI application on initial review in May 2017 and again on reconsideration in August 2017. AR 59-86. Riekens requested review before an ALJ, and the ALJ held a hearing by video on March 27, 2019. AR 19. On May 15, 2019, the ALJ issued a written opinion, following the five-step process outlined in the regulations.[3] AR 19-28. The ALJ found Riekens suffered from the following severe impairments: migraines, degenerative disc disease, fibromyalgia, depression, and anxiety. AR 21. At step three, the ALJ found Riekens's impairments did not meet or equal a listing (without specifically analyzing whether Riekens's migraines were equivalent to a listed impairment). AR 21-23. For purposes of determining Riekens's ability to perform her past work (at step four) and other work

---

[3] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." ***King v. Astrue***, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. § 404.1520(a)(4)**. The burden of persuasion always lies with the claimant to prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." ***Goff v. Barnhart***, 421 F.3d 785, 790 (8th Cir. 2005) (quoting ***Eichelberger v. Barnhart***, 390 F.3d 584, 591 (8th Cir. 2004)).

(at step five), the ALJ determined Riekens's residual functional capacity (RFC)[4]:

> [She] has the [RFC] to perform light work . . . except: she can never climb ladders, ropes or scaffolds, but can occasionally climb ramps or stairs, balance, stoop, kneel, crouch or crawl. [Riekens] can have no more than occasional exposure to occupational hazards (such as unprotected heights or dangerous, unguarded machinery). She cannot use power tools or have concentrated exposure to vibrating tools or machinery. She can have no more than occasional exposure to more than a moderate noise intensity level . . . . [Riekens] can have no more than occasional exposure to bright or flashing lights. [Riekens] needs to wear dark shaded glasses in order to tolerate sunlight or standard indoor florescent lighting, such as that used in offices and factories. [Riekens] cannot perform occupational driving before sunrise or after sunset. [Riekens] is limited to simple, unskilled work tasks. She may be off-task for as much as five percent of the workday and cannot perform work that is high-stress work . . . . She can tolerate only occasional changes in the work setting or work tasks.

AR 23. Based on her RFC, age, education, and work experience, the ALJ found that although Riekens could not perform her past work, other jobs existed in significant numbers in the national economy she could perform, including mail clerk, laundry worker, and photocopy machine operator. AR 28. Thus, the ALJ found Riekens not disabled. AR 28.

Riekens appealed the ALJ's decision to the Appeals Council. The Appeals Council denied review on January 3, 2020 (AR 1-3), making the ALJ's decision that Riekens was not disabled the final decision of the Commissioner. *See* **20 C.F.R. § 404.981**. Riekens filed a timely complaint in this court (Doc. 1). *See* **20 C.F.R. § 422.210(c)**. The parties briefed the issues (Docs. 14, 17, 18, 21), and the Honorable Leonard T. Strand, Chief United States District Judge for the Northern District of Iowa, referred this case to me for a report and recommendation.

---

[4] RFC means "the most that a claimant can do despite her limitations." *Sloan v. Saul*, 933 F.3d 946, 949 (8th Cir. 2019).

## II.    DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kirby*, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de novo." *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision." *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

Riekens challenges the weight the ALJ assigned to her subjective complaints and the medical opinions, whether some medical evidence supports the ALJ's RFC determination, and the ALJ's failure to address Listing 11.02.

### A.    Subjective Complaints

When evaluating the credibility of a claimant's subjective complaints—including pain or nervousness—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998); *accord* *Polaski*, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*,[5] 804 F.2d 456 (8th Cir. 1986). "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." *Black*, 143 F.3d at 386. The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may

---

[5] The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*. *Jones v. Callahan*, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

rest his credibility finding on "objective medical evidence to the contrary," ***Ramirez v. Barnhart***, 292 F.3d 576, 581 (8th Cir. 2002); or "inconsistencies in the record as a whole," ***Brockman v. Sullivan***, 987 F.2d 1344, 1346 (8th Cir. 1993). Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'" ***Schultz v. Astrue***, 479 F.3d 979, 983 (8th Cir. 2007) (quoting ***Hogan v. Apfel***, 239 F.3d 958, 962 (8th Cir. 2001)).

Here, not only did the ALJ discount Riekens's hearing testimony regarding the frequency and severity of her migraines, but he also seemingly discounted Riekens's statements about her migraines to her medical providers when seeking treatment (reflected in the treatment records). The ALJ found "no objective evidence of record . . . support[ed] or corroborate[d] the alleged frequency, duration or severity of the claimed migraines," noting that magnetic resonance imaging (MRI) and magnetic resonance angiography (MRA) of Riekens's head were negative and that "[p]hysical examinations have been normal with the claimant appearing pleasant and in no acute distress." AR 25.

First, as Riekens notes, "[d]octors use MRIs to rule out other possible causes of headache—such as a tumor—meaning that an unremarkable MRI is completely consistent with a migraine diagnosis." ***Moon v. Colvin***, 763 F.3d 718, 722 (7th Cir. 2014) (emphasis omitted). Second, many of the treatment records cited by the ALJ reflecting "no acute distress" are from times when the treatment records do not reflect Riekens reported currently suffering a migraine. *See* AR 452, 476, 480, 491, 496, 500, 508, 537, 565; *see also* AR 516 ("no acute distress," wearing dark sunglasses; denied migraine and reported only "current dull headache"); AR 521 ("no acute distress," reported suffering current headache); AR 526-27, 580 ("no acute distress" on days rated daily headaches 2/10 on pain scale). In addition, many of the records cited by the ALJ, although noting "no acute distress," are far from normal objective examinations (such as noting Riekens appeared uncomfortable or that the lighting in the room was dark or

6

dimmed[6]).  *See* AR 449 ("No acute distress. . . .  She does appear uncomfortable related to current migraine headache. . . .  She does smile occasionally today which is definitely an improvement."); AR 450, 454, 459, 465, 471, 522 (no acute distress, lights dimmed, wearing dark sunglasses over glasses); AR 518 ("[L]ying on exam table with dark sunglass on needing the lights dimmed and an ice pack in place. . . .  No acute distress."); *see also* AR 429 (emergency room (ER):  "[N]o acute distress. Cooperative, upset, crying.").  There are a few treatment records, however, from times when Riekens complained of a current migraine in which providers noted "no acute distress" and nothing further on objective examination, supporting the ALJ's conclusion that Riekens's migraines varied in severity.  AR 461, 498, 606, 871, 920, 930, 1000-03, 1068, 1169; *see also* AR 511-13 (reported worsening headaches and feeling terrible, but objective examination noted pleasant, no acute distress, and "appears to be feeling ok today").

The ALJ ignored numerous objective examinations in which providers observed signs and symptoms of Riekens's current migraine.  *See* AR 1171 (February 2012: Riekens "very miserable lying on the exam table rolled up on her side with her face covered to block the light from her eyes"); AR 1173 (February 2012: "[u]ncomfortable appearing[,] . . . prefers to sit in a darkened room," wearing sunglasses); AR 1179 (March 2012, ER: "Alert, mild distress[,] . . . sitting in a darkened examination room"); AR 1243 (March 2014, ER:  "obviously uncomfortable originally on our first exam," "it is apparent that she is having pain and is sensitive to light"); AR 1255 (August 2014, ER: "mild distress[,] . . . sitting in a dimly lit room . . . lying on the exam table with dark glasses, but not anxious or not ill-appearing"); AR 1279 (February 2015:  "prefers to sit in a darkened room wearing sunglasses, is uncomfortable and tearful"; also notes "very pleasant" and no distress); AR 551 (January 2016:  "Uncomfortable appearing[,] . . . prefers to sit in a darkened room"); AR 1318 (February 2016, ER:  mild distress, lights

---

[6] In his RFC determination, the ALJ found that Riekens could work around "bright or flashing lights" for up to one-third of an eight-hour workday and that she could tolerate sunlight and florescent lighting as long as she could wear sunglasses.  AR 23.

dimmed); AR 1321 (February 2016: "appears uncomfortable," "appears fatigued and slightly washed out," "no acute distress"); AR 1350 (July 2016, ER: mild distress, bloodshot left eye, exam room lights dimmed, wearing sunglasses indoors); AR 1388 (July 2016, ER: mild distress, wearing thick sunglasses, lying in a darkened exam room); AR 576 (March 2017: "[u]ncomfortable appearing[,] . . . prefers to sit with her sunglasses on to prevent worsening of her headache"); AR 627 (May 2017: "appears uncomfortable," "dark glasses on, lying in dark room when [provider] enter[s]," no acute distress); AR 611 (June 2017: no acute distress, "appears uncomfortable"); AR 857 (August 2017: appears uncomfortable, wearing two sets of dark glasses due to photosensitivity, often tearful during visit due to frustration); AR 1063 (April 2018: "[t]earful and uncomfortable appearing," wearing sunglasses); AR 1082 (June 2018: "appears uncomfortable, dark glasses on"); AR 1698 (March 2019: "appears uncomfortable, in no acute distress," wearing dark sunglasses). The ALJ also ignored the numerous treatment records reflecting that Riekens needed the room lights to be dimmed or dark (in addition to the records already cited, see AR 619, 621, 631, 670, 1120).

In discounting Riekens's statements about the severity and frequency of her migraines, the ALJ also concluded that Riekens's "migraines are controlled with medication." AR 24. The ALJ noted Riekens received deep tissue massages from a chiropractor twice a month (beginning as early as 2012, up to and through the relevant time period), and she often reported temporary improvement to any migraine or headache afterward. *See, e.g.*, AR 1661-75; *see also* AR 668 (cited by the ALJ; noting massages "help[ed] with the cervicogenic component to her headaches"). The ALJ also noted Riekens reported increased muscle looseness with osteopathic manipulation, but she never reported that this treatment helped improve her headaches,[7] and she eventually stopped

---

[7] *See* AR 654, 666, 668, 717, 729, 763 (treatment records cited by the ALJ reflect improved muscle looseness, not improved headaches).

treatment because it did not produce any long-lasting results (although she later returned briefly). *See* AR 670. She began receiving Botox injections every three months in March 2014 and sphenopalatine ganglion (SPG) blocks in July 2015, and she initially reported these injections helped with both the frequency and intensity of her migraines. *See* Doc. 14; *see also, e.g.*, AR 565, 582. Later treatment notes reflect Riekens reported SPG blocks acted only to abort current headaches but offered no preventative improvement. *See* 502, 893, 1037, 1081-82, 1340, 1392. And although she reported Botox improved the severity of her headaches, she still reported daily headaches and some severe migraines while receiving Botox injections; her provider eventually discontinued the treatment (in late summer 2017) because it was not working to control her headaches. *See* AR 849, 856, 861, 873, 1651. Riekens tried numerous treatments and medications (both preventative and abortive) to treat her migraines—including Topamax (topiramate), Aimovig, amitriptyline, Zonegran (zonisamide), gabapentin, tizanidine, Lortab (hydrocodone), Toradol injections, dihydroergotamine (DHE) injections, a Cefaly device (a transcutaneous electrical nerve stimulation (TENS) unit), and dry needling (in addition to the aforementioned Botox, SPG blocks, massages, and osteopathic manipulation). *See* Doc. 14; AR 665. While the treatment notes reflect that medications and other treatments provided some relief, Riekens has never improved to the point where she stopped seeking treatment for or stopped complaining about headaches. *See* Doc. 14. Substantial evidence does not support the ALJ's conclusion that Riekens's migraines were well-controlled with medication.

The ALJ also noted that the treatment notes reflect Riekens reported varying degrees of frequency for her headaches. AR 25. The ALJ found these inconsistent reports over the course of almost three years reflected "her symptoms are somewhat exaggerated." *Id.* But considered in chronological order, Riekens's reports do not reflect inconsistencies. *See* AR 1156 (early May 2016: reported twenty-eight headache days over the last four weeks, an increase from six months ago); AR 526 (late May 2016: reported ten to fifteen migraines per month with Botox and more than fifteen a month

prior to Botox); AR 511 (July 2016: reported migraines "quite frequently, sometimes several times a week"); AR 508, 1392 (August 3, 2016: reported four migraines a week and daily headaches; told a different provider she suffered three severe headaches every five days "greatly affect[ing] her ability to perform activities of daily living" and one "good day" every four to five days); AR 1507 (August 8, 2016: reported twenty migraines a month and daily headaches); AR 452 (August 17, 2016: reported "1 out of every 6 days with less intense headache, calling it more of a normal headache, not a migraine"); AR 502, 1395 (August 25, 2016: reported fifteen to twenty migraines a month; told a different provider she had one good day every four to five days and a daily headache that worsened about three times a week); AR 1405 (October 2016: reported eight to nine days with just daily headache and not migraines; noted she used to have just five good days); AR 491 (November 7, 2016: reported three to four migraines last week); AR 489, 1416 (November 22, 2016: reported chronic daily headache without "more severe headache, maybe 5 to 8 days per month"; reported to Botox provider that after last injection in late August 2016, she had five headache-free days in the first month and eight headache-free days in the second month; she also reported less severe headaches the first two and a half months before Botox wore off); AR 476 (December 2016: reported five to eight days a month of non-migraine headaches); AR 471 (January 4, 2017: reported severe migraine lasting the last two weeks; noted Botox was previously helping and migraines were lasting only three to four days; daily headaches continued); AR 664 (January 10, 2017: reported daily headaches, "some of which are tolerable, most of which are severe," and three to four days with no migraines); AR 465 (February 7, 2017: reported more frequent migraines last few months, only three days a month without); AR 457 (February 28, 2017: reported a few days without headaches, credited Botox); AR 454 (March 2017: reported daily headaches, only five days a month without migraines, and severe migraines two to four times a week, but noted Botox "helped with decreasing the overall severity"); AR 626 (May 2017: reported daily headaches, some tolerable, most severe, and five days a month without a severe headache, otherwise a

migraine-type headache almost daily); AR 610 (June 2017: reported five days per month without a migraine headache and daily low-level headaches); AR 847 (July 2017: reported twenty-five headaches a month; noted headaches increase in severity since stopping Botox); AR 856 (August 2017: reported twenty-five migraines a month and daily headaches; rated most severe headaches 5-6/10 on the pain scale with Botox, improved from 8-10/10 on the pain scale without Botox); AR 861 (September 2017: reported daily headaches and continuing to have some severe headaches); AR 892 (October 2017: reported twenty-seven migraines per month with only three functional days a month, where previously suffered twenty-five days a month with four to five functional days); AR 1036 (March 2018: reported daily headaches, twenty to twenty-five migraines a month, and five to eight days a month where not incapacitated from migraines); AR 1065 (April 2018: reported twenty to twenty-five migraines a month and daily headaches); AR 1072 (May 2018: noted daily headaches); AR 1081 (June 2018: reported twenty to twenty-five migraines a month and daily headaches); AR 1122 (September 2018: reported daily headaches, twenty to twenty-three migraines a month, and seven to ten good days a month); AR 1146 (December 2018: reported fifteen severe headaches a month and seven functional days a month); AR 1686 (February 2019: reported daily headaches and seven functional days in the last month); AR 1697 (March 2019: reported approximately ten days a month without a significant headache, improvement from having only five good days a month a year ago). As noted, Riekens tried many different medications and treatments over the relevant time period, which could bear on the frequency of her headaches. In addition, she reported numerous migraine triggers, including the weather; some variance in the number of headaches she suffered is to be expected.

Overall, the ALJ did not give good reasons for discounting Riekens's subjective complaints. The record overwhelmingly demonstrates that Riekens continued to suffer headaches and migraines throughout the relevant time period. I am particularly concerned with the RFC's failure to include any unexcused absences in the RFC (not

even one every two months), given that Riekens needed this accommodation for years prior to beginning extended work leave in May 2016, and given that the ALJ did not limit Riekens to workplaces without florescent lighting, a trigger to her migraines (and something she worked to change in her former employment). I recommend finding that the ALJ's decision to discount Riekens's subjective complaints is not supported by substantial evidence.

### B. Weight to Medical Opinions

Riekens challenges the weight the ALJ assigned to RFC opinions submitted by Timothy Buckley, DO, her treating rheumatologist, and NP Tornstrom, who treated her headaches. When determining a claimant's RFC, the ALJ considers medical opinions "together with the rest of the relevant evidence." **20 C.F.R. § 404.1527(b)**. For claims filed before March 2017, "[t]he ALJ must give 'controlling weight' to a treating [source's] opinion if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" ***Papesh v. Colvin***, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting ***Wagner v. Astrue***, 499 F.3d 842, 848-49 (8th Cir. 2007)); *see also* **20 C.F.R. § 404.1527(c)(2)**. "Whether the ALJ gives the opinion of a treating [source] great or little weight, the ALJ must give good reasons for doing so." ***Reece v. Colvin***, 834 F.3d 904, 909 (8th Cir. 2016). The ALJ considers the following factors to determine the weight to assign any medical opinion assessing a claimant's RFC:

> (1) whether the source has examined the claimant; (2) the length, nature, and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."

***Owen v. Astrue***, 551 F.3d 792, 800 (8th Cir. 2008) (quoting the current **20 C.F.R. § 404.1527(c)**).

### 1. Dr. Buckley's Opinion

Riekens met with Dr. Buckley, a rheumatologist, in mid-April 2016 (after last seeing him in June 2014), complaining of body aches, fatigue, and sleep problems. AR 1357. Dr. Buckley noted a number of tender points and indicated it looked like fibromyalgia but ordered a joint scan to rule out other causes. AR 1357-58. The next month, Riekens visited Dr. Buckley to treat left shoulder pain, and he determined she had rotator cuff tendinitis and gave her an injection. AR 487. She also reported past knee pain, lumps in the back, and arm muscle spasms, but noted her shoulder was "really what [wa]s bothering her the most . . . right now." *Id.* Riekens next saw Dr. Buckley in October 2016, where she again primarily complained of left shoulder pain caused by rotator cuff tendinitis (although she also reported pain all over, including in her knee and back). AR 485. She did not see Dr. Buckley again until almost a year later, on October 2, 2017. AR 876. On that date, she came in to have disability papers filled out, and Dr. Buckley's treatment notes reflect that "actually she filled out most of it herself, I filled out the rest." *Id.* She also complained of pain in her knees, hips, shoulders, and neck, and on objective examination, Dr. Buckley noted tenderness in "all the typical fibromyalgia tender points." AR 876-77. Based on her labs, he could not rule out the possibility of Sjogren's syndrome but noted she "probably has some fibromyalgia as well." *Id.* The record contains no other treatment notes from Dr. Buckley during the relevant time period (Riekens began seeing rheumatologist Daniel Small, MD, instead). *See* Doc. 14.

The form completed by Dr. Buckley in October 2017 reflects two different handwritings. *See* AR 697-701.[8] The "frequency and length of contact" and "subjective complaints" sections, as well as the date next to Dr. Buckley's signature, are in a

---

[8] The form appears out of order in the record—the last three pages (AR 696-98) appear before the first three pages (AR 699-701).

"chicken scratch" handwriting.  AR 698-99.  Other notations on the form are in a neat, block handwriting.  On a question asking to check which symptoms of fibromyalgia Riekens suffers (of which almost all the symptoms are checked), block handwriting next to "seizures" explains that Riekens experienced this symptom as a "child (age 7)."  AR 700.  Checkmarks also reflect that Riekens must have a job that permits shifting positions at will from sitting, standing, or walking; that she would need to take unscheduled breaks during an eight-hour workday (and in block handwriting, indicates these breaks will be "daily"); that she can occasionally lift up to fifty pounds; and that she can sit and stand for less than 2 hours in an eight-hour workday (block handwriting next to this question indicates "not working @ this time").  AR 697, 701.  Block handwriting answers "none" in response to the question, "How many city blocks can your patient walk without rest or severe pain?"  AR 697.  Someone circled that Riekens can only sit for fifteen to twenty minutes at a time and stand for fifteen minutes at a time.  *Id*.  Dr. Buckley left blank the question asking whether Riekens needs a job that allows periods of walking around, and chicken scratch handwriting next to the question reflects "cannot work."  *Id*.  The form concludes recommending the following accommodations: a limit of sitting twenty minutes at one time and standing ten minutes at one time (the "10" and "20" appear to be in the block handwriting), and checking boxes indicating Riekens will need unscheduled breaks and two or more unscheduled absences a month.  AR 698.

The ALJ assigned this opinion little weight.  AR 27.  The ALJ noted the signature was "illegible" and thus the source was unknown.  AR 27, 698.  As Riekens notes, however, the cover page to the exhibit indicates the form is from Dr. Buckley, and the Social Security Administration labeled the exhibit "Fibromyalgia Questionnaire, dated 10/02/2017, from BUCKLEY TIMOTHY DO" in the court transcript index.  AR 695.

The ALJ provided an additional reason for assigning the opinion little weight: "internal inconsistencies."  AR 27.  Riekens argues that the ALJ erred by failing to explain how the opinion was internally inconsistent, citing *Lucus v. Saul*, 960 F.3d 1066 (8th Cir. 2020).  In that case, the Eighth Circuit noted:

14

[A]lthough inconsistencies can justify rejecting a treating physician's opinion, the ALJ did not make her reasoning "sufficiently specific to make [it] clear to any subsequent reviewers." **SSR 96-2p**[, **61 Fed. Reg. 34490**, 34492 (July 2, 1996)]; *see also Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005). Like the district court, we do not understand the purported inconsistencies identified by the ALJ. And "[a]bsent some explanation for finding an inconsistency where none appears to exist," we will not fill in the gaps for the ALJ. *Reed*, 399 F.3d at 921.

*Id.* at 1069 (bold emphasis added). Here, unlike in *Lucus*, at least one internal inconsistency is readily apparent (although minor): on one page of the RFC form, the form indicates Riekens can sit for fifteen to twenty minutes at a time and stand for fifteen minutes at a time; but on a different page, it indicates she can sit for twenty minutes and stand for ten minutes at a time. AR 697-98. It could also be said to be inconsistent that most of the questions about Riekens's abilities in an eight-hour workday are answered, but not the question asking whether she would need "periods of walking around during an 8-hour workday"—instead, Dr. Buckley (in his chicken scratch handwriting) noted she "cannot work." AR 697.

Here, Dr. Buckley's treatment note from October 2017, as well as the different handwritings on the RFC form, make it clear that Riekens largely filled out the form herself (in neat, block handwriting). I recommend finding that substantial evidence supports the ALJ's decision to assign Dr. Buckley's opinion little weight.[9]

### 2. *NP Tornstrom's Opinion*

For claims filed before March 27, 2017, a nurse practitioner is not considered a treating source whose opinion may be entitled to controlling weight. *See* **20 C.F.R. §§ 404.1502, 404.1526(a)(1)**; **Revisions to Rules Regarding the Evaluation of Medical**

---

[9] In addition, the ALJ's discussion of Riekens's activities of daily living (including that she can go out to dinner, drive forty-five minutes from her house to doctor's appointments, and go grocery shopping) further support the ALJ's decision to discount the opinion, as these activities are inconsistent with an inability to sit for more than twenty minutes at a time or an inability to walk one city block without resting. *See* AR 26, 417, 427.

**Evidence**, **82 Fed. Reg. 5844** (Jan. 18, 2017). Nevertheless, the Eighth Circuit has recognized that the opinion of a treating nurse practitioner may be entitled to great weight under certain circumstances. *See **Lacroix v. Barnhart***, 465 F.3d 881, 886 (8th Cir. 2006).

NP Tornstrom first saw Riekens in February 2016 (NP Tornstrom took over Riekens's neurological care after another provider, who Riekens had seen since June 2013, left her practice). AR 1321. NP Tornstrom treated Riekens's headaches as her neurological provider throughout the relevant time period. *See* Doc. 14. Riekens challenges the weight the ALJ assigned to three of her opinions, issued in April 2016, August 2017, and June 2018. AR 403-05, 694, 702-03.

NP Tornstrom completed FMLA paperwork for Riekens's job in April 2016. AR 403-05. In that form, she indicated that Riekens needed sporadic leave (up to eight hours per month) for appointments related to her migraines, specifically noting Riekens had appointments for Botox once every three months and may need additional appointments. AR 405. She also opined that two times a month for up to two days at a time, Riekens would suffer migraine flares during which she could not work. *Id.* In addition, NP Tornstrom noted Riekens would benefit from extended leave when Riekens was "in a cycle of headaches," as working "prevent[ed] them from getting better [and] seem[ed] to make them worse." *Id.*

In August 2017, NP Tornstrom completed a form titled "Physical and/or Mental Work Excuse/Restrictions." AR 694. She checked boxes indicating that Riekens could understand, remember, and carry out simple instructions, but that she would not be able to maintain attention for two-hour periods, that she would need unscheduled breaks, and that she would likely be absent two or more days a month. *Id.* She explained:

> [Riekens] suffers from severe, frequent, intractable migraine headaches with associated symptoms including vertigo, vision disturbance, photosensitivity, phonophobia, etc. She has these migraines 25 out of 30 days per month. Her condition prevents her from being able to concentrate [and] focus[,] making it very difficult to be successful in a job. Not only

16

does she have headaches, she also suffers from chronic fatigue and fibromyalgia further complicating her condition. Bright light, sound, smells and weather changes trigger migraines for [Riekens]. Her migraines can be unpredictable and very difficult to treat. Even Botox treatment has only minimized the severity of her migraines.

*Id.*

In June 2018, NP Tornstrom completed paperwork for Riekens's long-term disability benefits through her job. AR 702-03. She noted that Riekens suffered migraines causing head pain, vertigo, nausea, photosensitivity, and phonophobia. AR 702. She indicated Riekens's migraines affected her ability to focus, concentrate, and remain upright for extended periods, because she needed to lie in a dark room when her symptoms were severe—and she had severe symptoms twenty-five days per month. *Id.* She noted that Riekens would not be able to return to work in the next six months, concluding Riekens "continues to struggle with chronic intractable migraines and the associated symptoms[,] making it impossible to perform at any employment capacity at this time." AR 703.

The ALJ assigned little weight to any opinion "made before the claimant's alleged onset date," including the April 2016 FMLA form from NP Tornstrom, finding these opinions were "not relevant to the pertinent time period." AR 27. The ALJ also assigned little weight to NP Tornstrom's August 2017 and June 2018 opinions, addressing them together with opinions from other providers. AR 26. The ALJ found (1) that they were "not supported by the objective medical evidence of record," (2) that they were "heavily dependent upon the claimant's own subjective reporting of symptoms, frequency, duration, severity, and functional limitations caused by her migraines," and (3) that "[t]here is no evidence to support a finding that the source has personally observed the opined frequency severity duration of the claimant's claimed migraines or that the opinion is based on laboratory findings or any other objective evidence." *Id.*

Opinions rendered outside the relevant time period—particularly those issued less than a month prior to the alleged onset date—are not necessarily irrelevant to the determination of the claimant's limitations during the relevant time period. *See Pirtle v. Astrue*, 479 F.3d 931, 934 (8th Cir. 2007). And the ALJ's other reasons for discounting NP Tornstrom's opinions relies on the same faulty reasoning used to discount Riekens's subjective complaints. Therefore, I recommend finding that the ALJ did not give good reasons for discounting NP Tornstrom's RFC opinions.

### C.     Some Medical Evidence

When determining a claimant's RFC, the ALJ must consider "all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). The ALJ's RFC determination must be supported by at least some medical evidence that "addresses the claimant's ability to function in the workplace." *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001) (quoting *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001)). As a general rule, "an ALJ is . . . 'required to consider at least some supporting evidence from a [medical] professional.'" *Id.* (alteration in original) (quoting *Lauer*, 245 F.3d at 704).

Here, Riekens argues that the ALJ erred in relying on opinions from the state agency medical consultants rather than opinions from her treating sources. I have already determined that the ALJ did not give good reasons for discounting Riekens's subjective complaints and NP Tornstrom's opinions related to Riekens's migraines. But if the district court finds otherwise, the ALJ's reliance on the state agency medical consultants' opinions would not provide an independent basis for remand. *See Vance v. Berryhill*, 860 F.3d 1114, 1120-21 (8th Cir. 2017) (holding that when the ALJ gives a good reason for discounting a treating physician's opinion, the ALJ may "rely instead on the opinions of the state agency medical consultants," as long as those opinions are "more consistent with the medical evidence"); *Kamann v. Colvin*, 721 F.3d 945, 948-51 (8th Cir. 2013)

18

(rejecting claimant's argument that the ALJ "formulated his own medical opinion" when the ALJ rejected the RFC opinion of the one-time examining psychologist and instead relied on a "thorough[] review[] [of] years of medical evidence on record" to formulate an opinion "consistent with the views of . . . the reviewing agency psychologist"); ***Stormo v. Barnhart***, 377 F.3d 801, 806-807 (8th Cir. 2004) (finding some medical evidence supported the ALJ's physical RFC determination when it was consistent with the state agency medical consultants' opinions, and at least one treating physician's physical RFC opinion was in the record but assigned non-controlling weight); ***Anderson v. Shalala***, 51 F.3d 777, 779-80 (8th Cir. 1995) (holding that the ALJ's RFC determination was supported by substantial evidence when the ALJ relied on the opinions of two reviewing physicians; the opinions of treating physicians to the extent they were based on objective evaluations, but not the claimant's subjective complaints; and an independent analysis of the medical evidence).

### D.     *Listing 11.02*

During the third step of the disability determination, the ALJ considers whether the claimant's impairment or combination of impairments meets or equals one of the listings of presumptively disabling impairments set forth at 20 C.F.R. part 404, subpart P, appendix 1.  **20 C.F.R. § 404.1520(a)(4)(iii)**.  "[A claimant's] impairment[] meets the requirements of a listing when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement."  **20 C.F.R. § 404.1525(c)(3)** (citation omitted).  A claimant can equal the listings in one of three ways:

> (1)(i) If [the claimant] ha[s] an impairment that is described in [the listings], but—
>> (A) [The claimant] do[es] not exhibit one or more of the findings specified in the particular listing, or
>> (B) [The claimant] exhibit[s] all of the findings, but one or more of the findings is not as severe as specified in the particular listing,

(ii) [The Social Security Administration] will find that [the claimant's] impairment is medically equivalent to that listing if [the claimant] ha[s] other findings related to [the] impairment that are at least of equal medical significance to the required criteria.

(2) If [the claimant] ha[s] an impairment(s) that is not described in [the listings], [the Social Security Administration] will compare [the claimant's] findings with those for closely analogous listed impairments. If the findings related to [the claimant's] impairment(s) are at least of equal medical significance to those of a listed impairment, [the Social Security Administration] will find that [the claimant's] impairment(s) is medically equivalent to the analogous listing.

(3) If [the claimant] ha[s] a combination of impairments, no one of which meets a listing, [the Social Security Administration] will compare [the claimant's] findings with those for closely analogous listed impairments. If the findings related to [the claimant's] impairments are at least of equal medical significance to those of a listed impairment, [the Social Security Administration] will find that [the claimant's] combination of impairments is medically equivalent to that listing.

**20 C.F.R. § 404.1526(b)**. "To prove that an impairment or combination of impairments equals a listing, a claimant 'must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'" ***KKC ex rel. Stoner v. Colvin***, 818 F.3d 364, 370 (8th Cir. 2016) (quoting ***Sullivan v. Zebley***, 493 U.S. 521, 531 (1990)); *see also* **20 C.F.R. § 404.1526(a)**.

Here, the ALJ concluded at step three that Riekens's impairments did not meet or equal the severity of any listing. AR 21-23. The ALJ specifically considered Listing 1.04, Listing 12.04, and Listing 12.06. AR 22. Riekens argues that because the ALJ found she suffers from migraines, the ALJ erred by failing to analyze Listing 11.02.

The Commissioner responds that any error was harmless. "Although it is preferable that ALJs address a specific listing," the Eighth Circuit has consistently held that "failure to do so is not reversible error if the record supports the overall conclusion." ***Pepper ex rel. Gardner v. Barnhart***, 342 F.3d 853, 855 (8th Cir. 2003); *accord* ***Vance v. Berryhill***, 860 F.3d 1114, 1118 (8th Cir. 2017); ***Scott ex rel. Scott v. Astrue***, 529 F.3d 818, 822-23 (8th Cir. 2008); ***Karlix v. Barnhart***, 457 F.3d 742, 746-47 (8th Cir.

20

2006).  "[R]emand is appropriate [only] where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit [a court] to conclude that substantial evidence supports the Commissioner's decision."  *Scott*, 529 F.3d at 822-23 (holding that remand was required when the record contained factual inconsistencies that the ALJ failed to resolve).  Thus, even if the ALJ erred in failing to address Listing 11.02, remand is not required if the record shows Riekens's impairments did not meet or equal that Listing.

Listing 11.02, governing epilepsy, provides for listing-level severity based on the type of seizure, the frequency with which they occur, and, if less frequent, a marked limitation in one of the following categories: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.  **20 C.F.R. pt. 404, subpt. P, app. 1 § 11.02**.[10]  This Listing went into effect on September 29, 2016, and applies to ALJ decisions issued after that date (as here).  **Revised Medical Criteria for Evaluating Neurological Disorders**, 81 Fed. Reg. 43048, 43051 & n.6 (July 1, 2016).  Prior to that

---

[10]    11.02 *Epilepsy*, documented by a detailed description of a typical seizure and characterized by A, B, C, or D:

> A. Generalized tonic-clonic seizures, occurring at least once a month for at least 3 consecutive months despite adherence to prescribed treatment; or
> B. Dyscognitive seizures, occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment; or
> C. Generalized tonic-clonic seizures, occurring at least once every 2 months for at least 4 consecutive months despite adherence to prescribed treatment; and a marked limitation in one of the following:
>> 1. Physical functioning; or
>> 2. Understanding, remembering, or applying information; or
>> 3. Interacting with others; or
>> 4. Concentrating, persisting, or maintaining pace; or
>> 5. Adapting or managing oneself; or
> D. Dyscognitive seizures, occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment; and a marked limitation in one [of the categories in C.1-C.5 above.]

**20 C.F.R. pt. 404, subpt. P, app. 1 § 11.02** (citations omitted).

21

time, there were two listings for seizures:  Listing 11.02, which governed convulsive seizures "occurring more frequently than once a month in spite of 3 months of prescribed treatment"; and Listing 11.03, which governed nonconvulsive seizures "occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment."  **20 C.F.R. pt. 404, subpt. P, app. 1 §§ 11.02, 11.03** (2016).

Riekens relies on *Mann v. Colvin*, 100 F. Supp. 3d 710, 719 (N.D. Iowa 2015), in which the court discussed medical equivalence to then-in-effect Listing 11.03 (which appears most similar to the current Listing 11.02B).  In *Mann*, the court noted that section DI 24505.015(B)(7)(b) of the Social Security Administration Program Operations Manual (POMS) provided an example of when an impairment involving migraines would equal the severity of then-Listing 11.03:

> A claimant has chronic migraine headaches for which she sees her treating doctor on a regular basis.  Her symptoms include aura, alteration of awareness, and intense headache with throbbing and severe pain.  She has nausea and photophobia and must lie down in a dark and quiet room for relief.  Her headaches last anywhere from 4 to 72 hours and occur at least 2 times or more weekly.  Due to all of her symptoms, she has difficulty performing her [activities of daily living].  The claimant takes medication as her doctor prescribes.  The findings of the claimant's impairment are very similar to those of 11.03, Epilepsy, non-convulsive.  Therefore, 11.03 is the most closely analogous listed impairment.  Her findings are at least of equal medical significance as those of the most closely analogous listed impairment.  Therefore, the claimant's impairment medically equals listing 11.03.

100 F. Supp. 3d at 719.  It appears this provision of the POMS was no longer in effect at the time of the ALJ's decision (it was not in the POMS on the Social Security Administration's website as early as September 2018,[11] likely removed as a result of the change to the seizure Listings).  In August 2019 (after the ALJ's decision), the Social Security Administration issued guidance providing that the seizure listings continue to be

---

[11] *See **David G. v. Berryhill***, No. 17-CV-3671 (HB), 2018 WL 4572981, at *5 (D. Minn. Sept. 24, 2018).

the most analogous listings for headache disorders. **Social Security Ruling (SSR) 19-4p**, **84 Fed. Reg. 44667**, 44671 (Aug. 26, 2019). SSR 19-4p provides:

> While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and [the Social Security Administration] may find that his or her [impairments] medically equals the listing.
>
> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).
>
> Paragraph D of listing 11.02 requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one area of functioning. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider for 11.02B and we also consider whether the overall effects of the primary headache disorder on functioning results in marked limitation in: Physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.

*Id.*

Although the ALJ did not address Listing 11.02D, he made findings relevant to that listing. Listing 11.02D requires proof of a marked limitation in physical functioning or in the four broad areas of mental functioning. The ALJ's RFC determination (that Riekens can perform modified light work) supports that he did not find Riekens suffered

marked limitations in physical functioning.  *See* AR 23.  And at step three, the ALJ specifically found when addressing other listings that Riekens did not suffer marked limitations in the four broad areas of mental functioning.  AR 22-23.

Riekens does not challenge these findings.  Instead, she argues that the nature and frequency of her migraines alone establish equivalency.  Listing 11.02B does not require proof of marked limitations, just more frequent seizures—once a week.  Riekens argues that the evidence supports she suffered severe migraines weekly, despite treatment, and that remand is required for the ALJ to make a specific determination regarding the frequency and severity of her migraines.  The Commissioner responds that the ALJ's discussion of Riekens's headaches when determining her RFC supports that Riekens's migraines were not so frequent or severe to equal Listing 11.02B.

The treatment records support that Riekens consistently complained of and sought treatment for headaches and migraines.  She often reported suffering multiple migraines a week.  Multiple FMLA forms from years before Riekens quit working reflect that she would need to miss work at times due to migraines and headaches.  The ALJ did not include any RFC limitation related to unexcused absences, instead seemingly finding that Riekens's headaches were never so severe that they would cause her to miss work.  *See also* AR 476 (Riekens reported missing her family's Thanksgiving in November 2016 due to severe migraine).  As I have already discussed, this finding is not supported by substantial evidence.  I recommend finding that remand is required for the ALJ to address how often Riekens's headaches would cause her to miss work—and whether Riekens's headaches and migraines are so frequently severe that her impairments equal Listing 11.02.  *See Mann*, 100 F. Supp. 3d at 720-21 (holding that the failure to consider then-in-effect Listing 11.03 was not harmless given "sufficient evidence of chronic, severe migraine headaches during the relevant time period," including multiple visits to the ER complaining of migraines despite treatment).

### III.    CONCLUSION

I recommend **reversing** the Commissioner's decision **and remanding** to the Social Security Administration for further proceedings consistent with this report and recommendation.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 27th day of August, 2021.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa